JOHN V. RICE, JR., appellant,

*v.*

CHARLES MITSCH et al., respondents.

[Decided June 20th, 1921.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Buchanan, who filed the following opinion:

"Complainant by his bill alleges himself to be the equitable owner of certain real and personal property recently conveyed to defendant Swift by defendant Mitsch—the legal title to the same being in the latter at and prior to such conveyance, and held by him as security for the repayment by complainant of such balance (if any) as remained unpaid, of the moneys advanced by Mitsch at complainant's request, in acquiring the title to the property in question. He asks an accounting to.

determine what balance, if any, is due from himself to Mitsch, and a decree for the reconveyance of the property to himself upon his payment of that balance. Defendant Swift is alleged to have bought from Mitsch with notice of complainant's equitable interest. Restraint against conveyance by Swift is also prayed, and an order for such restraint *pendente lite* was granted on a preliminary application.

"It appears by the proofs that in 1915 the executors of one Nathan Haines held judgments against Rice, Mitsch and others, on which Rice was the debtor actually liable as amongst the several judgment debtors, and also held a certain real estate mortgage and two chattel mortgages as collateral for the payment of the judgment debts. The judgments aggregated $8,-242.37; Mitsch, however, being judgment debtor only as to about $4,000 thereof. The real estate mortgage held as collateral was for $3,000, covering property of the value of about $12,000, then owned by one Cromwell, but occupied by Rice under a contract of purchase from Cromwell. Rice still owed a balance of $2,000 of the purchase price. The mortgage had originally been made by Cromwell to third parties and had been purchased by Rice, and later assigned by him to the judgment creditor as collateral.

"As to the chattel mortgages the evidence is not as clear as it might be, but, apparently they had been made by Rice to Haines as security for moneys borrowed to purchase certain machines, and the indebtedness which they were originally given to secure had been reduced to the $8,242.37 before mentioned. They covered machines installed in a factory erected on the premises comprised in the real estate mortgage. In 1915, and for some years prior thereto, these machines [and, possibly, the factory building] were owned by a corporation called the Rice Gas Engine Company, in which Mitsch and Rice were both interested.

"About February, 1915, the Haines executors took steps to collect the money due them on the judgments, and Mitsch, at the solicitation of Rice, borrowed money from the bank and paid the amount due on the judgments, taking assignments of the judgments and of the collateral. It was also arranged at the

same time that Mitsch should pay Cromwell the $2,000 balance of unpaid purchase price. This was in fact carried out, although, because of various delays, he did not get the deed until toward the close of the year.

"In the latter part of the year 1915, also by arrangement between Rice and Mitsch, Mitsch had the judgments and the real estate mortgage canceled of record, and held a foreclosure sale of the machinery covered by the chattel mortgages, becoming, himself, the purchaser of these machines for the price of $8,000, as shown by the bill of sale from the bailiff. Then a lease was made of the machines and the factory, and that portion of the lands on which the factory stood, to one of the war-time ammunition companies, for a rent of some $600 a month, received by Mitsch. Rice continued in possession of the remainder of the lands, including the dwelling-house thereon, paying no rent therefor. Mitsch, out of the rents received by him, paid substantial amounts monthly to Rice, and used the balance for the taxes, insurance and other expenses of the property, and for the reduction of the indebtedness incurred by him in obtaining the moneys to purchase the judgments, collateral and real estate, as previously mentioned, and also for the reduction of certain other indebtedness incurred by him on Rice's account prior to 1915.

"The contention of the complainant, Rice, is that the arrangement between himself and Mitsch was that Mitsch should hold the title to the lands and machinery simply as security for the reimbursement of the moneys paid out in the acquisition and maintenance of such lands and machinery and should convey all of the property in question to Rice as soon as the reimbursement should be completed. He also contends that this reimbursement has in fact already been had by Mitsch out of the rents received.

"Mitsch's contention is that he was to procure out of the property in question repayment not only of the amounts stated by Rice, but also of some $12,000 of other indebtedness from Rice to himself [this $12,000 debt, Rice claims, was extinguished by an executory agreement dated September 23d, 1913, performance of which, however, admittedly, had not been made by Rice prior to the commencement of this suit, and had been

refused by Mitsch when tendered after the filing of the bill herein], and that a sale of the property was to be negotiated by Rice within three years, and the proceeds of such sale over and above the amount necessary to pay the indebtedness were to be divided equally between himself and Rice; that the sale, not having been made within the three years, he, Mitsch, now has absolute title to the property.

"I think that a closer examination of the nature of the actual transactions of 1915, as disclosed by the admitted or uncontroverted facts and circumstances, will be of value in arriving at a determination of the matters at issue.

"As to the real estate, worth from $12,000 to $15,000, Cromwell held the legal title, subject to the $3,000 mortgage, and had also a vendor's lien for the unpaid $2,000 of the purchase price. The Haines executors had title to the $3,000 mortgage, but only as collateral security for the judgment debts. Rice had the equity in the mortgage [subject to the payment of the judgment debts], and had the equity in the premises [subject to the mortgage and subject to the vendor's lien]. His interest in the real estate, therefore, was of the approximate value of $7,000 as long as the assignment of the mortgage remained outstanding.

"As to the machinery and other chattels, legal title was in the Rice Gas Engine Company, subject to the chattel mortgages held by the Haines executors. The indebtedness secured by the chattel mortgages had been reduced to the $8,300 of the judgment debts. The value of the chattels covered by the mortgage, Rice says, was over $50,000. Assuming that, as between Rice and the gas engine company, the latter was obliged to pay the $8,300 judgments held by Haines against Rice, the company owned an equity in the chattels of over $40,000; Rice's only interest in these chattels, if and after the $8,300 should be paid to Haines, being as the owner of three shares of stock in the company [out of an outstanding issue of somewhere between seven thousand and ten thousand shares].

"Assuming that there was no agreement for Mitsch to hold any of the property as security for other than the amounts then presently advanced, then when Mitsch paid the $8,300 and took

the assignment from the Haines executors, he merely stepped into their shoes. If the Rice Gas Engine Company [which we have assumed to be the party ultimately liable for the $8,300] paid Mitsch the $8,300, Mitsch would have had to cancel the chattel mortgages, and Rice would have been entitled to receive back his $3,000 mortgage against the real estate. But as to the agreement which Mitsch says was made by Rice, that Mitsch should also hold this collateral as security for the prior indebtedness of $12,000 of Rice to him, it is, of course, obvious that Rice had no power or authority to make such a disposition of the property of the Rice Gas Engine Company. It would have been invalid, as *ultra vires,* if made by that company itself, giving accommodation security for Rice's personal debt.

"Mitsch proceeded to foreclose the chattel mortgages by sale. Rice testifies that before the sale he 'requested Mitsch,' and 'arranged with Mitsch,' to purchase the mortgaged chattels for him, Rice, at the sale, and Mitsch 'consented to do so.' He also testifies that he, Rice, arranged with the ammunition company [the then lessee and operator of the mortgaged chattels] not to bid at the sale, and also arranged with one Bartlett, the secretary and treasurer of the Rice Gas Engine Company, of which Rice himself was president, that that company, the owner of the $40,000 equity in the chattels, should not bid.

"It is apparently upon this last-mentioned promise or 'consent' of Mitsch to purchase the machinery for Rice that Rice bases his claim to equitable ownership of the machinery and his prayer for a conveyance thereof. [Doubtless, Rice did not mean by this testimony that Mitsch did not have the right to hold the machinery as security for the $8,300, or the $10,000; it is one of many instances of loose or wild statements which makes his testimony unreliable.] Where, however, is there any consideration to support such a promise by Mitsch and make it enforceable? There is no evidence of any consideration whatever. Rice put up no money or other thing of value; Mitsch purchased with $8,000 of the $8,300 owed him by the gas engine company as the balance of mortgage debt. Rice did not give Mitsch the right to purchase—Mitsch had that already. The only thing that appears as even colorable consideration is the act of Rice

in keeping bidders away from the sale so that Mitsch could buy cheaply. But such action on Rice's part, if it was a part of a 'contract' between himself and Mitsch, is illegal and invalid as any consideration to support Mitsch's alleged promise—it was a barefaced fraud on the gas engine company, of which Rice was president and director.

"I am entirely satisfied from the testimony that that is precisely what the scheme was on Rice's part—to have Mitsch foreclose and sell the machinery; have him buy it in at a nominal figure and hold it for the benefit of Rice, or Rice and Mitsch—thus personally acquiring at the expense of the gas engine company the value of that company's equity in the machines; and that is precisely the scheme that was carried out. I am by no means sure that Mitsch knew or understood the real nature of the transaction. Mitsch is a man of little education and of no high order of intelligence—he had faith in Rice, and Rice's promises, and Rice's knowledge of financial matters, and relied upon Rice to get back the moneys he had advanced for so many years. However, Mitsch's guilt is but of little moment—it is the hands of complainant that are under scrutiny. It need scarcely be said that the aid of equity will not be extended to obtain for complainant the fruits or any part thereof of any such fraudulent project. That a denial of relief to Rice in this behalf leaves Mitsch in possession of the property may be regrettable from a broad viewpoint, if Mitsch is guilty together with Rice, but it would not help the gas engine company to take from Mitsch to give to Rice. On the other hand, a denial of relief to Rice is not a refusal of aid to the gas engine company, which is not a party to this suit.

"Complainant's counsel urges that Rice has offered to consent that the property be decreed to be reconveyed to the gas engine company. I do not recall any such offer. What Rice did say was, 'I am going to turn that [the machinery] over to them [the company] except the house I reside in; it has been my intention all along.' But if there was, or is, any such consent, the difficulty is that the Rice Gas Engine Company is not a party. Mitsch has given no such consent, and the rights and liabilities

as between Mitsch and the gas engine company have not been in issue and cannot be determined in this suit.

"As to the real estate the circumstances were somewhat different, but the result it seems to me must needs be the same. The evidence, to my mind, is overwhelming that Rice had the conveyance made by Cromwell to Mitsch in order to hinder, delay or defraud his, Rice's, creditors. There was no other reason why the title should have been put in Mitsch's name. Mitsch put up $8,300 for the judgments and collateral and had agreed to put up the $2,000 for the acquiring of the real estate. He had ample security for the $8,300, the chattel mortgages on property worth much more than $8,300 [according to Rice, worth $50,000]; the $3,000 real estate mortgage, the judgments against Rice and the other judgment debtors. The $3,000 mortgage on the real estate would in itself have been ample security for the $2,000 he was putting up, or Rice could have given him a separate $2,000 purchase-money mortgage. Rice says he didn't think of doing this, but that is not credible. It is not in accordance with what the evidence shows to have been his nature and habit, which was to get rather than to give without necessity; and from his long experience in financial dealings and devices it is impossible to believe him when he says he did not think of giving a $2,000 mortgage instead of a deed. Rice also says it was because 'the ammunition company wanted it that way.' This, again, I cannot believe. It could not concern the ammunition company whether the title were in Rice or Mitsch, as long as they had both been properly bound to the lease. The attorney who acted for the ammunition company was not called to testify nor his absence explained. Mr. Swaim, the attorney who acted for Rice and Mitsch, says that the ammunition company wanted title to the machinery to be in Mitsch, but makes no such statement as to the real estate. He does say that Mitsch insisted [in conversations between Swaim, Rice and Mitsch] on having a conveyance of the title instead of a mortgage because Mr. Bartlett and Mr. Butts were about to bring suits for large amounts against Mr. Rice, and Mr. Mitsch felt that the money he was about to put up would not be secured in the shape of a

mortgage. [This, it will be noted, contradicts Rice's statement that 'he never thought about giving Mitsch a mortgage.'] Of course, a deed as security was of no greater value than the mortgage would have been, and it by no means follows that Mitsch really believed it would be. It would be very improbable that Rice and Mitsch would disclose to a reputable attorney a scheme to defraud creditors, even if Mitsch was not a guilty party to such a scheme. Rice might well have told Mitsch that he would be more secure with a deed. Mitsch says that he was to get absolute title to the property; that Rice was trying to see that he, Mitsch, was paid for his previous loans no matter what happened to the other creditors.

"However, we are not so much concerned with Mitsch's testimony; of course, if it be true, and Rice turned over to him the equity in payment for previous debts, then Rice is not entitled to get it back. But Rice, the complainant, is the one asking for relief in this court. By his own admissions on the witness-stand he owed some accounts [including a board bill of over $700 and a hotel bill, in Trenton, of over $100]; there were numerous judgments against him, and creditors were pressing him, and there were these imminent suits against him by Butts and Bartlett for large amounts. With all this in mind, coupled with Rice's contradictory explanations above mentioned, it is impossible to believe otherwise than that his idea and endeavor in having Mitsch take title [if he were not making payment to Mitsch] was to keep the property away from the reach of his creditors. It is, therefore, the typical case of a suitor coming into a court of equity with unclean hands, and he will not be heard.

"Not being entitled to relief against Mitsch, he is, of course, not entitled as against Swift, and a decree will be advised dismissing the bill."

*Mr. Linton Satterthwaite,* for the appellant.

*Mr. Harold B. Wells* and *V. Claude Palmer,* for the respondents.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Buchanan.

*For affirmance*—THE CHIEF-JUSTICE, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, KATZENBACH, WHITE, HEPPENHEIMER, WILLIAMS, GARDNER—13.

*For reversal*—None.